Good morning. Illinois Appellate Court, First District Court is now in session. The Fourth Division, the Honorable Justice Robert E. Gordon presiding. Case number 1-9-1-6-3-7, Liddick, Voigt & Meyer versus S.A.O.P.U.L.L.C. Well, good morning to all. Would the lawyers who are going to argue the case please introduce yourself to the court? I'm sorry, I couldn't hear that Mark. I'm sorry, I'm sorry, Justice Gordon. My name is Eric Sparks. I represent S.L.P.U.L.L.C. Good morning, this is Danielle Gould. I represent plaintiff and counter-defendant in the appellee cross-appellant Liddick, Voigt & Meyer limited. Okay, now for the appellant, do you want to reserve some time for rebuttal? Yes, I would judge. How much time? 15 minutes. No, no, no. Your whole argument is going to be 15 minutes for rebuttal. Do you want to reserve some time for rebuttal? Do you understand our process here or not? My prior argument, the argument of the appellate court was an hour long, Your Honor. No, no, no. I don't know any appellate court in the United States or any other country that has an hour. I've never heard of it. Do you intend for us to- You have 15 minutes. 15 minutes. Of the 15 minutes, do you want to reserve some time for rebuttal? Or maybe you want to waive rebuttal? You have to tell me. I would like to reserve five minutes of the 15 minutes, Your Honor. Okay, then let's proceed with your case. Thank you. May it please the court. In this appeal, S.L. Prew brought a reformation claim in this dispute. The trial court ruled in favor, as you know, after a trial of Leidig, the tenant, in connection with this contraction fee dispute. And the reformation claim, the trial court's errors are against the manifest weight of the evidence. And we urge the court to reverse the trial court's ruling. The elements in support of reformation of the Seventh Amendment to the lease were proved by clear and convincing evidence in the trial court- Can I interrupt you for a moment? So you're seeking a reformation to change the date of the amortization period to September 30th, 2025. And your argument is that's the end of date of the lease. But where and when exactly did the parties agree to that particular date? Thank you, Justice Reyes, for that question. The letter of intent that was executed by the tenant after four months of negotiations of the letter of intent set forth in every iteration of the letter of intent that the second component of the unamortized costs for the contraction fee would be in the lease amendment. And they set forth this pricing mechanism of the unamortized costs. Unamortized costs only arise in the event that the tenant here would exercise this option to surrender back part of its space. So by exercising that contraction option, for the first time, rents would no longer be paid for the contracted space. And that's what causes unamortized costs, which is the term set forth in the executed letter of intent. Didn't the trial court in the order indicate that the letter of intent did not state any amortization period? That's correct, Judge. The trial court stated that the letter of intent does not expressly state an amortization period. What the trial court missed in that connection is that the letter of intent's reference to unamortized costs running at 10% interest is the key term, which is not reflected accurately in the seventh amendment to the lease. Because those unamortized costs can only arise when there's no longer rent being paid. And we know what the time period is if they exercise the option. We know that the time period for unamortized costs has to be from the date that they give back the space to the end of the lease, running through to the end of the lease. And that's why the end date of the amortization period has to be the end date of the lease, which of course was confirmed eight years later when the tenant's own broker, who had negotiated the letter of intent with the tenant, prepared a subleasing analysis. And in doing that subleasing analysis, they used the end date of the lease as the end date for the amortization period. Which confirms- But what evidence was presented to the trial court to establish that Lydick was mistaken as to this time period and as to the amount that was going to be due and owing at the end of the amortization period? It's not the amount that's due and owing, that the amount due and owing at the time of the letter of intent, the parties are considering what the pricing mechanism is going to be for the exercise of that contraction option, if it is exercised. At that point in time, they don't know what the actual broker's commissions or what the tenant improvement costs are going to be. But they state that those upfront leasing costs that the landlord puts into the deal, those upfront leasing costs are going to be the basis for what is calculated for the pricing of the contraction fee, for the unamortized cost component of the contraction fee. So in the letter of intent, those terms are spelled out and it is built into the meaning of the term unamortized costs as this component of the pricing mechanism, that the end date for the amortization period would be the end date of the lease, which of course we see. Let me ask you this, in regards to the letter of intent as well. According to the trial court, BF Prue didn't sign it. Right? Pardon me, Judge. I'm sorry, I could not hear that. Okay. I said, according to the record, the trial court indicated that BF Prue did not sign the letter of intent. That is correct, Judge. BF Prue did not sign the letter of intent. You got an agreement here. Even though the letter of intent, according to the trial court, wasn't binding. In the trial court believed that the letter, the trial court stated that the letter of intent was not binding, which is an erroneous application of the law of reformation. The law of reformation states that the only thing that needs to be proven is that there was a prior understanding relating to the term that is subsequently incorrectly placed into the eventual instrument. And that prior understanding here, the evidence is clear that the broker on behalf of the landlord sends the, authorized to send the letter of intent to the tenant, negotiates, they negotiated the letter of intent over a period of four months, and the tenant then signs it under the heading that it was accepted and agreed. And that letter of intent itself states that the parties are going to take the terms of the letter of intent and put it into the lease amendment. And in fact, we see subsequently, after the very first draft of the lease amendment is sent from the landlord's side to the tenant's side, this is after the execution of the lease amendment, sorry, after the execution of the letter of intent, three days later, the landlord's side sends the first draft of the lease amendment to the tenant. The tenant's attorney gets the first draft. The tenant's Mr. Peterson testifies, he sees the first draft, and they both testify that in seeing the first draft, they recognize that the contraction date had been placed as the end date for the amortization period, and that they knew at that time that it meant that it was impossible for there to be any unamortized costs. So they knew, even though the letter of intent that they had negotiated for four months and signed by the tenant under the heading that it was accepted and agreed, that document stated that there would be the unamortized cost component of the contraction fee. But three days after executing that letter of intent, they get the first draft, and the first draft, they notice that the contraction date has been put in there, and they knew it was a bad date. They knew that it meant that there couldn't be any unamortized costs. But they- How was Leidig supposed to, what evidence do you have that they knew that? Oh, their testimony, Your Honor. The testimony of Mr. Peterson, the testimony of Mr. Stevens, who is the attorney for the tenant. And they testified that that was their understanding upon seeing the very first draft of the lease amendment. And after receiving this, this goes to their understanding, this goes to their, the evidence that shows that they understood that that date was inserted by mistake. There are 390 words in the lease amendment describing how to calculate this component of the contraction fee, the unamortized cost component of the contraction fee. When they saw that date, they knew, the tenant's agents knew that it was impossible to have any unamortized costs because of that date. And yet they did not, they did not reach out to the landlord's side to say, are you trying to get rid of the unamortized cost component? Are you giving up this component of the contraction fee? They left it in the document, despite it having no purpose in the document if the unamortized costs have to be zero by definition. But they leave it in there. And the reason why they leave it in there is clear because they know that it's to their great benefit if they stay quiet. But the law requires them, if they see that mistake, the law requires them to inform the other side of it. And they failed to do that here. In addition, if you look at the first handwritten, if you look at the comments by the tenant's attorney, Mr. Stephens, and referring here in the record, his handwritten comments on the first draft are at C-5281. Mr. Stephens' handwritten comments, he makes comments throughout the first draft, handwritten comments, striking out large portions. Virtually every page has handwritten comments on it until you get to the section dealing with the unamortized costs for the contraction fee. Was that presented to the trial court? I mean, why did the trial court indicate that BF and Leida didn't mutually agree to an amortization period? The court made that erroneous finding on the, because she ignored the, she ignored the presence of this in the document, in the Seventh Amendment to the lease. She ignored the consequence of this and their testimony about it. She followed the principle that you have to assume that the party signing the document knows the contents of it and must have intended it to include those contents. But that principle, that legal principle is not applicable in a reformation case. And we cite to the case law that states this, in the case of estate of Blakely and in the case of Mahone versus State Farm. It's clear, the case law on reformation is clear that of course that principle doesn't apply. If it did, you could never have a reformation of a written instrument. It would be impossible. There's always a mistake in the written instrument. That's the very foundation for a reformation claim. So the trial court here ignores the evidence that the tenant side admitted that they knew the date meant that it made the unamortized costs impossible. The court- I know you are now past your time, but I think what you're trying to tell us is that there are factual issues here and the case should not have been decided by a summary judgment. Isn't that what you're trying to tell us? No. No? No, it's a trial. Oh, okay, yeah, this was a trial. Okay, I'm sorry. I do have a question though, if I can, young man, because you were talking about the letter of intent and you said there was strikeouts, but you were about to say something about the unamateur, and the word is so hard to say and I'm too tired to say it today, but you were about to say something about that particular section and the strikeouts. If you could just tell me what you were about to say. Thank you, Justice. Yes, the handwritten comments by the tenant's attorney when he reviewed the first draft of the lease amendment, there are comments on every page of the document until you get to the section dealing with the unamortized costs. And he admitted that he saw the contraction date had been put in there as the end date of the amortization period, and he knew that it meant that it made the unamortized costs impossible, but he doesn't make any comment in that section. There's no handwritten comment. However, and this goes to the point that the party in a case where you're seeking reformation on the basis of mistake on one side and so-called fraud on the other, the fraud term there only needs to show that the other party knew the mistake was in the document and doesn't inform the other side about its presence. But alternatively, it can also be the basis if the other side conceals the mistake. And here, there is also evidence of a concealment, because if you look at that section in the handwritten comments, you can see that there was a handwritten comment. There's a little caret that was inserted, and you can see the remnants of a line and up to a line of writing that has been whited out by the attorney for the tenant. So the attorney for the tenant in preparing his written comments on the first draft of the lease amendment clearly was going to make a comment on that section, but then deleted it. And they never made any other comment about the contraction date being used as the amortization end date to the landlord. They concealed that, and of course they don't raise the question. They also don't say, they don't suggest to the landlord's side, you should just delete this. If they believed that the landlord's side was really attempting to throw away the unamortized cost component for the contraction fee, even though they had just spent four months negotiating that in the letter of intent, and had refused to give a 2% discount on the interest rate in the letter of intent for those unamortized costs, it's absurd to believe that the tenant thought that that's what the landlord intended to do. It makes no sense to put this bad date that makes the unamortized costs impossible  It was contrary to the terms of the letter of intent. And it made the unamortized costs impossible. And so that's why here, the evidence, the manifest weight of the evidence shows that the tenant knew and understood that that was a mistake in the document. They don't inform the other side. And instead, in fact, they even conceal it. They don't take the actions that you would take if you actually believed at the time that the parties intended to get, that the other side intended to just drop out this cost component of the contraction fee. I have a quick question. So the amendment, the seventh amendment went through several drafts as you indicated. And in each of the drafts, the 2017 date was there. So isn't it just possible it's the other way around? They just assume, well, you know, if that date's there, that must be the date that they want, right? Because it was in all the drafts that were submitted between the parties and the date never changed. It was always the 2017 date. The date is always, in all of those drafts of the lease amendment, you're right, Judge, that the date is always the contraction date. The contraction date was changing as to what it was going to be, but it was always the contraction date in every draft. So the landlord's attorney inserts this by mistake into the initial draft of the lease amendment, but the other side stays quiet about it and they never notice it. No one ever picks up on this bad date, even though it makes the unamortized cost component impossible. And they had just been, they just negotiated four months to get a letter of intent that says the second component of the contraction fee is going to be these unamortized costs. So it belies reason to think that for them to claim that when they saw this draft, that the landlord must have intended to do it. It doesn't make any sense. And in fact, when the tenants, Mr. Peterson testified, he was asked what was the purpose of leaving all this language in the document if it had to be zero? And his answer was, it's hard to assess what the purpose is. Of course, it's hard to assess what the purpose is. It makes no sense. No one would leave that in the document. No one would leave it in the document unless they thought they wanted to take, they wanted to preserve their chance to take advantage of this mistake if they ever exercise the option, which is exactly what they did. They waited, there's eight years go by, they then go and ask their own broker to do a calculation. That broker calculates it using the end date of the lease for the end date of the amortization period. Then they asked the new landlord to calculate it. And they say, hey, we wanna exercise our contraction option. And when the landlord does, the new landlord does so and sends back, sends the calculation of the contraction fee, that's when the tenants, Mr. Peterson responds by letter saying, oh no, you've got that wrong. You used the wrong date. The date in the lease amendment says it's supposed to be the contraction date. That means that there can't be any unamortized costs. And that's why they claim their contraction fee was only one of the components, the five months of rent. And that's what they paid. And then they deposited the disputed funds into the court. And they went into the court and said, hey, we want a declaratory judgment. We want a declaratory judgment because we want you to enforce this amendment the way it's written. Even though they knew when they saw the very first draft that it had this bad date in it. And they kept quiet about it. And then they tried to take advantage of it. And the trial court misses this and gets this wrong because the trial court viewed the case under the lens. The trial court applied case law principles that do not apply to reformation cases. The trial court applied contract interpretation principles such as the party who signs it must be presumed to know the content of the document that has no application in this case. And in addition, the trial court erred in stating that the testimony of the landlord's attorney who testified that she inserted that by mistake into the first draft was inadmissible. And that itself was clear error and an abuse of discretion because the attorney for the landlord is the person who knows that she inserted that date by accident into the end date of the amortization period in the lease amendment. So that's how the trial court makes these errors and gets this wrong. But if you look at the letter of intent and if you look at the seventh amendment to the lease, it's clear that there's a variance between them. The unamortized cost component is made impossible by the insertion of this bad date. And it's exactly the kind of error  And that's why, your honors, the trial court should be reversed. There are further points. The trial court also barred the admission of expert testimony. This is laid out in our opening brief. Barred the expert of the landlord who was to testify concerning the unamortized costs  in connection with letters of intent. The trial court barred the admission of that expert, Mr. Caruso, barred the admission of F2 expert testimony regarding it as well. So- Why don't you reserve some time on rebuttal? Thank you, judge, I will. Okay, let's hear from the other side. I can't hear. Your mic is muted. I apologize. Good morning, Danielle Gould. I was hoping to reserve two minutes of my argument because I have, there's a cross appeal issue to address. So separate from the reformation issue. Well, normally we just allow you to argue, okay. You're a 15 minutes or whatever we give you and the only rebuttal we give is to the appellant. I apologize, I didn't mean reserve rebuttal, but just that I would use some of my time for that. Yeah, okay, that'll be fine. Okay, may it please the court. I just want to start generally trying to address what the whole variety of issues raised by SL Prue. And I will say this case did go to trial. We had been on summary judgment. I think largely the facts were not disputed, but they were so conflated. And there was a lot of speculation and conclusion that I think the trial court, which here was Judge Sophia Hall said, I need to hear all the evidence at trial. And we went to trial and we had a week long trial. She heard from nine live witnesses. She had evidence depositions to consider and hundreds of pages of documents. And she weighed and considered that evidence and she did so without error and with applying the correct law. I will say that this is a case in equity. However, you also have to meet the reformation standard. And here SL Prue was required to meet every element of that standard by clear and convincing that the highest burden there is in a civil case. Judge Hall considered all of that factual evidence that was presented and determined that the manifest weight of the evidence supported that SL Prue couldn't meet any element of reformation here. It was not even a close call. Now for the meeting of the minds, start looking at these elements. Meeting of the minds, was there some meeting of the minds of the agreement that SL Prue wants to impose here? And just as an aside to put context to this, SL Prue was the landlord at 2 Prudential Plaza. At the time, the contraction option was exercised. SL Prue was entitled to a contraction fee as set out in the amendment. But SL Prue was bound by the agreement the prior landlord BF Prue had made. And in a reformation case needed to address the meeting of the minds met by BF Prue and Leidig. And here Leidig expected the formula, whatever the formula may be, whatever that amortization number may be, the expectation of Leidig was related to the cost. This makes sense for the tenant. It's not going to just agree to this concept and wonder later how much it will be. It was critical to Leidig to know how much is this going to cost us should we choose to exercise it? And that is why before the execution of the amendment, Mr. Peterson conducted that calculation to estimate that cost. And he understood that the cost would be approximately a few hundred thousand dollars. That's the expectation and intention that's reflected in the record in this case. For BF Prue, it's presumed to have expected the same thing. And it was incumbent upon SL Prue to present evidence to rebut that presumption that exists in the law that the agreement you signed is the agreement you intended. And they did not- Can I interrupt you one second, counsel? So, but their argument is that by Leidig's silence, that was proof, if I understand their argument here, if you're making today, is that by their silence, that was proof that there was a mutual mistake because they sat back and they knew that there was the wrong date and they didn't do anything about it. And so just by their mere silence, because they were exchanging these documents, that was a substantial proof that there was mutual mistake. Actually, your honor, that's not their argument. Their argument is that there was silence leading to an alleged fraud here as a basis for reformation. So before we get- I'm gonna have to do my follow-up, but go ahead. So before we get to the basis for reformation, which would have to be either mutual mistake or unilateral mistake and some kind of fraud, we have to establish a prior meeting of the minds. So before we even get there, we have to figure out what was the expectation of the parties? Because if you don't have a prior meeting of the minds that matches the agreement that S.L. Proulx is saying exists here, we don't get to the analysis of the basis for reformation. So I will get to, if you don't mind, I will get to the issue that you've raised, but I'd like to first establish and discuss that meeting of the minds standard, which is, so there's no meeting of the minds because Leydig never expects an end of lease September 30, 2025 amortization date. It's not presented to it in any writing. It doesn't have any assumptions about what usually happens in any real estate transaction. It's only considering, and so no date is stated other than that May 17 date. It's expecting though, and it's concern is how much does this cost? And like I said, they figured that out and it works for them because they expected around a few hundred thousand dollars. And then from B.F. Proulx, does B.F. Proulx reach any meeting of the minds for the agreement that S.L. Proulx wants to impose? Well, the analysis there is that they're presumed to have agreed to something. They're presumed to have agreed to what's in the amendment. So now we look at the mutual mistake analysis because we don't have a meeting of the minds just solely because of Leydig. I mean, Leydig's not agreeing to what S.L. Proulx is saying. There is no establishment that it came to a clear, concise agreement of end of lease amortization that results in a $1.4 million fee. There is no evidence of any comprehensive agreement or knowledge that that was what they were agreeing to. So we don't have a meeting of the minds, but putting that to the side and moving on to basis for reformation. We don't have a mistake, a mutual mistake, even if there was some prior meeting of the minds. And here's why. Again, there can't be a mistake. If there was even some knowledge, they'd move on to the point of analyzing the agreement and they're analyzing it based on cost. And what Judge Hall found is that because it was so important to Leydig what the amount was, if they had in any way comprehended at the point they're evaluating this, there's a $1.4 million fee, no matter what possibly you want to impose upon them for some agreement before, they wouldn't have moved forward. They wouldn't have agreed to the 1.4. Steve Peterson was on the path to determining the cost. And if his analysis had left him stuck or in the unknown, he would have done more. It was important for them to know what the amount was. And because their intention was not 1.4 million, upon any determination that that could possibly be the number or that the number would be the few hundred thousand they were going to agree to, the agreement wouldn't have gone forward. So there's no mistake. I believe that Ms. Grogan originally came up with that figure and provided that to Mr. Peterson. Oh, Ms. Grogan's calculation is performed eight years later. She's not part of the... This is an analysis of what's happening in 2007 and what's the mindset in 2007. The only reason Ms. Grogan's analysis is relevant is because the contracting parties intentions could potentially be gleaned from subsequent conduct. So the only thing you can glean from this is that someone calculates 1.4 million. Here it was Ms. Grogan who admitted at trial that that was a mistake in calculation, that if she had actually looked at the contract, she would have come up with a different calculation. But the really relevant point here is that when Mr. Peterson saw that calculation, I can't remember his exact testimony. He was certainly shocked. I don't know if he said his mind was... His mind exploded, but it was something along those lines. Because that was far and away too high compared to what he was expecting. And so he recalculated himself and he said, that was not, thankfully, she calculated wrong. And I can read now that I was still correct. Because he was worried about, oh my gosh, I've done my firm wrong by having failed them the years before in agreeing to something that would be 1.4 million. So he was worried about that and was able to confirm, know that he was correct when they entered into the agreement. So that's what that is relevant to telling you. For the mutual mistake, Leidig doesn't make a mistake. But then it's very interesting here how BF Proulx doesn't make a mistake either. Or certainly there's no evidence to support that they made a mistake. Because the mistake analysis is done at the point of execution. It's where are you, where's your mind, your knowledge, your intention at the time you're executing the document? Well, the only, there was no BF Proulx representative at this trial. And the person who signed the amendment on behalf of BF Proulx was C. Frederick Weba III, second or third, I apologize. And he was not at the trial. There was no evidence and no testimony from anyone else as to what was going on with Mr. Weba at the moment he was signing the agreement. No, excuse me, but was he involved in the negotiations? I know the record shows that he signed the amendment, but I don't know whether I should say the contract, but was he involved in the negotiations? Well, I know that there's in the record, there's meetings that he's involved in. So he is aware, for example, that Leidig is shopping around and may or may not be interested in staying at Two Prudential Plaza and is looking. So I know that there were meetings that he was involved in exactly what the day in and day out, whether he was CC'd. I would actually say, yes, Your Honor, he was certainly involved. He was involved in meetings and he was CC'd and presented with all of these drafts and documents. So yes, he was involved in the negotiations. And then he is at the point of execution and there's no evidence to suggest that he did not intend what he was presumed to intend. And that was what was written in the amendment. Mr. Weba, you know, here's a possibility. He read it. Even if, let's say, even if he didn't agree to it, right? Even if the, excuse me, let me get reversed there and start over. It's possible that the intention is for the calculation to be what it is, but we don't know. I mean, maybe there's a tax or accounting reason. There was certainly enough reason for Leidig and its counsel to believe that BF Prud intended what it proposed. But consider this. See, Frederick Weba could have read that provision, saw that, well, that's not what we wanted, but I want to get this deal done. This deal isn't about a contraction option. This deal is about extending a lease at a major downtown building, multiple floors for 18 years. And there's been months of negotiation, months of back and forth. Knowing their attorney is the one who drafted this thing and edited and reviewed it. And you're at a point in time where this needs to get signed. He certainly could have looked at that and said, I'm just going to sign. Now I'm speculating, but the point is, is I'm not the one who has to put the evidence forth to establish what's going on with Mr. Weba at the point that he signs. That was for BF Prud to establish. And they certainly cannot establish that there is no possibility that he didn't intend exactly what's presumed. They don't present any evidence, nothing to say, no, we would have never agreed to that even. There's nothing. And so you're stuck with the presumption that what was signed is what was intended by BF Prud. With that presumption, there can be no mistake. Now, moving on to fraud as a basis for reformation. Well, that's inevitably going to fail because it would still depend on a mistake by BF Prud. But it also, so you can't prove the mistake, but you also can't prove the fraud. But claim to be, have, excuse me, that they claim that Leidig somehow engaged him. So what's the fraud they claim? That what BF Prud's attorney wrote on paper and exchanged back and forth, their statement is it's a fraud that Leidig didn't say, hey, is what you wrote what you meant? That is absolutely not supported under Illinois law. There's some sort of standard where attorneys or parties to contracts have to question whether what the other side put on paper is what they really meant. It's not going to, could you be in the realm of a mutual mistake analysis when there's a prior agreement established and the writing doesn't reflect it? You could be. And then you need to look at if those facts exist, the analysis under a mutual mistake analysis. But in the world of fraud, if you put it down on the paper, you cannot claim that someone didn't tell you what you wrote, or frankly, if you didn't write it, what you could have read yourself. That is not a fraud. And we have case law in the first district that talks, there's one, there's the Leon case. I'm sending. Leon versus Max E. Miller case. In that one, an employer and an employee were entering into an agreement and the employer basically says, does it say what I want it to say? And the employee says, yes, and it doesn't say what he wants it to say. I said, that's not a fraud because you could read that yourself. You can go read that and know if it says what you want it to say. You can't fail to follow your duty to read the documents and then say a fraud was committed upon you. Now, SL Prue has argued that the duty to read standard doesn't apply here. And he does so by citing insurance cases, which are talking about a different standard, not the duty to read a contract before you sign it. But in that instance, it's the application where a policy and insurance policy has been issued and it's prepared by the insurance company. And it's not something that they sign, but it's something upon which the insurer can make a claim. It's a completely different situation where they're looking at whether you have to read that in advance or not and how it applies. But as for a basic contract, the first district is unequivocal in the case law that's out there that the duty to read does come into play. And the case that's a perfect example for that is the Magnus case. In that case, there was a seller who wanted to sell property and hold back a house option on the property. There was actually a letter of intent in that case too. And the letter of intent, unlike in this case where the letter of intent says nothing about the amortization period, in that instance, the letter of intent referenced the house option. And the other side, the buyers specifically negotiated that option out with the seller's counsel, but the seller claimed he didn't know about that. And then he said, you had to tell me that it was taken out and you committed a fraud because I didn't know. And part of the court's analysis, and this was a reformation case, was to say, you could have read it. Setting aside that your attorney actually negotiated it for you, you had a contract in front of you. All you had to do is read it. You can see the house option isn't there. There's no fraud. So Judge Hall absolutely applied the law as it should be applied after considering an enormous amount of evidence to establish the facts. And she determined that the manifest weight of the evidence here fully supported a finding that SL Prue failed not only to meet one element, which would cause it to lose the reformation claim, but all of them, all of them. It was not a clear case. What was the connection between BF Prue and Bentley Forbes? I don't know for sure. I think there's some evidence in the record from a 2008 letter is what SL Prue submits to try to establish that relationship. But I think what's relevant to your question, your honor, is because it's trying to establish who is the agent or who is the contracting party for BF Prue. And so the issue in the case is that they wanna argue that Hans Mumper is effectively a contracting party, that he is the BF Prue representative. But there's no evidence in 2007 at the time that the amendment is negotiated and signed as to what the relationship is between those two entities. Is that why they got objected to Mr. Mumper's testimony? But more so, I would say, no, is that Mr. Mumper admits in his testimony that he does not have any authority to agree to contract terms or contract for BF Prue. He admits that he's not their agent. He admits all these things in his testimony, but it's very important to understand, I guess, who are the contracting parties? The contracting parties are the, because you're looking into their minds, their intentions, their knowledge. So it's very important to understand who is the contracting party. It's not every agent of the company. It's the contracting party or those agents who have the authority and ability to agree to and execute contracts with these terms at issue. Thank you. Could I address the cross appeal? I have one other question. What's the, what is pending at the circuit court right now? Thank you, Your Honor. So this is a 304A appeal to address the decision.  to recover its fees. And so our fee petition remains in the trial court, which actually leads me to the cross appeal because the other, the two main forms of relief that Leida is entitled to is its attorney's fees and also the release of $1.1 million that's been sitting in an escrow. Though- As to the fees, since the petition is still pending at the circuit court, how do we have jurisdiction over that issue? Over the fee issue or the- Over the fee issue. Because you said that the fee issue is still pending in the circuit court, right? You're correct. We're not, this appeal is not over the attorney's fees. It's about the money that's in escrow. It's about the money that's in escrow because- Okay. Yes, because the court, the trial court, after the decision, we have effectively two forms of relief. One is the attorney's fees and that's still pending below. And the other is this escrow. So we put $1.1 million into an escrow. And the reason that was done is because Leida needed to exercise the contraction option. And S.L. Proulx was saying, we're not going to honor your exercise of the option unless you pay us $1.4 million. And so the way to ensure that we could properly exercise it and have S.L. Proulx actually honor that was to put the money into the escrow. So $1.1 million goes into the escrow and there's an agreed order saying that it will be there pending disposition of the case. Okay. I thought you had filed a motion with this court regarding attorney's fees. Yes, that was another issue I did want to make sure I got to other than the cross appeal. And that was- Oh, the fees. That was, we're not asking you to adjudicate the fees. I'm simply asking that, hopefully upon prevailing in this court, that the case would be remanded to the trial court so that we can address the fees incurred for the appeal. And I- There's something else that you wanted to, is there an issue that you missed that you wanted to argue? Well, so I'm sorry, I'm addressing the request for remand, but we do want to have the $1.1 million released. That is an issue on appeal. That is our cross appeal. And so the issue is the interpretation of the order, effectively a contract interpretation of what disposition of the case means. And it's our position, the case law in Illinois, there's references to disposition of cases being the trial court's decision. It doesn't depend upon the appeal being completed. When there's a disposition of the appeal is at issue, then the phrase disposition of the appeal is used. And in the order that's at issue, it says disposition of the case. It doesn't say pending all appeals, or there's no reference or suggestions of that. So it's our position that that money should be released immediately because the case has been disposed with the trial court's decision. And the only thing that remains is the collateral matter of attorney's fees. Okay, well, thank you very much. Does anyone on the panel have any additional questions? No. No, counsel, I think we still have the rebuttal though. Yeah, yes, we do, we do. Okay, let's hear the rebuttal. Thank you, your honors. Briefly, I'd like to address the point about Mr. Lumper's testimony, which was improperly ruled inadmissible by the trial court. Mr., the error of the trial court in connection with Mr. Lumper's testimony is that trial court erroneously believed that only a signatory to the lease amendment could testify in connection with the reformation claim. And this is an error. The reformation law is clear that parole evidence is admissible. Mr. Lumper, who was the asset manager of Bentley Forbes, during the time period, Mr., the Bentley Forbes entity was the managing member of BFPREW. This is referenced in our opening brief. Mr. Lumper was the person, and you can see him on the emails in connection with the drafts of the lease amendment and in connection with the emails of the letter of intent negotiations. Mr. Lumper is referenced throughout. He was involved throughout, but the court excluded his testimony, despite the fact that he said in his testimony that the date that Ms. King, the attorney for the landlord, inserted into the lease amendment made no sense. It made it impossible for there to be any unamortized costs. And he confirmed that it's something that he did not catch when he reviewed the drafts of the lease amendment. Now, it's clear, he also points out, that it's the end date of the lease, which is what should be the end date of the amortization period in the lease amendment, because that is what, that is the end date for the unamortized costs. Unamortized costs only apply from the time that the tenant gives back the space and is no longer paying rent, from the contraction date all the way through to the end of the lease. So he says, as you can see from the letter of intent, the letter of intent says that there's going to be the unamortized costs as the second cost component for the fee. The court disregarded his testimony. Now, I wanna mention as well, Mr. Weyba, there's no need for Mr. Weyba to testify in connection with this. Mr. Weyba, in light of all of the evidence, there's absolutely no evidence to demonstrate that the parties changed course after the letter of intent to zero out the unamortized costs component of the contraction fee. There's no evidence whatsoever to support the parties changing their position. In fact, it wouldn't even make any sense if they had changed their position, they certainly would not have left 390 words in the document specifying how this is supposed to be calculated if they intended to make it zero. And think about this in the context of the negotiations. If the landlord was giving up what amounts to 80% of the contraction fee and does so in the very first draft of the lease amendment, there would be some negotiation, some recognition of a concession being made, a change after the letter of intent, but there is none because there isn't any. And as Ms. King, the attorney for the landlord testified, she put it in there by mistake.  and it's contrary to the letter of intent. She knew that she at the time didn't realize that she had put the contraction date in for the end date of the amortization period. She missed it, but she made a mistake. And the landlord side of the transaction didn't notice the mistake. Now who did notice the consequence of that bad date? It was the tenant, the tenant's attorney and the tenant's Mr. Peterson testified that they saw that the date meant that there could be no unamortized costs, but they keep quiet about it so that they can take advantage of it later down the road. And that's exactly what Leidig did. And they do that despite the fact that when their own broker calculates the fee, the broker calculates the unamortized costs at a million two and they do so using the end date of the lease for the amortization date, exactly the date that we claim is the true date that the parties intended. They intended that in the letter of intent. That's what unamortized costs mean when you're using it as a pricing mechanism. And yet the Seventh Amendment failed to reflect the party's true intentions by putting in a date that made that impossible and makes no sense in the document. So, I'll mention one last point on that. Ms. Grogan's calculation and Mr. Rogers' calculation and presentation of the cost of the contraction fee when Mr. Rogers, who is the tenant's broker, when he calculated the contraction fee in 2015, he sends it to them. It states, Mr. Peterson gets it. It puts that unamortized cost component at a million two because they're using an estimate of what the underlying costs actually were when they calculated it. Those underlying costs were the broker's commissions and the tenant improvement allowance that the landlord put into the deal at the very beginning. Those are the costs which get amortized over the period of the lease. It gets treated like it's a loan. And so to exercise the option, they have to pay back the portion that isn't being paid by rent anymore. And that's what this mistake in the lease amendment, that's the problem that this mistake in the lease amendment created. It's contrary to the terms of the intention of the parties expressed in the letter of intent, which says you're going to have these unamortized costs as the second component of the contraction fee. Thank you very much. I have a question, counsel. If we were to affirm the circuit court, why shouldn't Leideck get their escrowed funds? So those, I'm sorry, your honor. Did you say if you affirm the trial court? Right, why are they not entitled to the escrowed funds? They would only be entitled to the escrowed funds at the final disposition of the case. If the case continues, and that's only simply a matter of the agreed order in connection with the depositing of the funds into the court. It's the final disposition of the case. If this court were to affirm the trial court, which I urge you not to do so, there are the manifest weight of the evidence and the legal errors here require that the trial court be reversed. But if you did so, that is the reason in respect to the cross appeal suggested by the cross appeal made by the tenant here. That's the reason why it should not be ordered because the case will not yet be at a final disposition. Okay, thank you very much. Any other questions? No, sir. Thank you for giving us a very interesting case and you'll have an order or an opinion very shortly. Thank you. The court will now be adjourned.